UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MARIJA PAUNOVIC and DUSAN PAUNOVIC, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>OBI SEAFOODS LLC and OCEAN BEAUTY SEAFOODS LLC,<br><br>Defendants. | CASE NO. C21-884 MJP<br><br>ORDER ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND MOTIONS TO AMEND & DEFENDANTS' MOTION TO CERTIFY QUESTION AND STAY |

This matter comes before the Court on Plaintiffs' Motion for Class Certification (Dkt. No. 53), Plaintiffs' Motion to Amend the Scheduling Order and for Leave to Amend the Complaint (Dkt. No. 105), Plaintiffs' Motion to Amend the Scheduling Order (Dkt. No. 103), Defendants' Motion to Certify Question to State of Alaska Supreme Court (Dkt. No. 66), and Defendants' Motion to Stay (Dkt. No. 68). Having reviewed the Motions, the Oppositions (Dkt. Nos. 78, 80, 81, 119, 120 ), the Replies (Dkt. Nos. 82, 83, 86, 127, 128), and all supporting materials, and having held oral argument on September 1, 2022 on all Motions, the Court: (1)

GRANTS Plaintiffs' Motion for Class Certification; (2) DENIES Defendants' Motion to Certify

Question; (3) DENIES Defendants' Motion to Stay; (4) DENIES Plaintiffs' Motion to Amend

the Scheduling Order and for Leave to Amend the Complaint; and (5) GRANTS Plaintiff's

Motion to Amend the Scheduling Order.

## BACKGROUND

Plaintiffs Marija and Dusan Paunovic bring claims under the Fair Labor Standards Act

(FLSA) and the Alaska Wage and Hour Act (AWHA) against their former employers Defendants

OBI Seafoods LLC (OBI) and Ocean Beauty Seafoods LLC (Ocean Beauty). (Complaint ¶ 1

(Dkt. No. 1-1).) Relevant to the pending Motions are Plaintiffs' claims that Defendants failed to

pay fish processors on a biweekly basis and to pay fish processors minimum wage for time spent

in quarantine. Plaintiffs seek certification of two classes:

> **Quarantine Class**: All current or former employees of OBI Seafoods LLC and/or Ocean
> Beauty Seafoods LLC who were hired to perform fish processing work and, after
> December 2019, were subject to a mandatory quarantine period during which they were
> paid less than the minimum wage rate multiplied by eight or more hours for each day
> spent in quarantine.

> **Delay Class**: All current or former employees of OBI Seafoods LLC and/or Ocean
> Beauty Seafoods LLC who at any time after May 2019 were hired to perform fish
> processing work and were paid at greater intervals than biweekly.

(Pls. Mot. for Class Cert. at 9 (Dkt. No. 53).) Defendants oppose class certification and ask the

Court to instead certify the following question to the Alaska Supreme Court, concerning the

Quarantine Class:

> Did the minimum wage requirements of the Alaska Wage and Hour Act apply to fish
> processing workers during the mandatory COVID-19 quarantine period the State of
> Alaska required the workers to complete prior to beginning work during the 2020 season?

(Defs. Mot. to Certify at 1 (Dkt. No. 66).) Defendants ask the Court to stay the case while the

Alaska Supreme Court considers this question. (Dkt. No. 83.)

1    The Court first reviews the facts concerning the Parties and then addresses the facts

2    specific to the two proposed classes.

3    **A.    The Parties**

4        Plaintiffs reside in Serbia and have worked in Alaska as fish processors on H-2B work

5    visas. (Compl. ¶¶ 6-7, 15-16, 18.) Marija Paunovic worked for Ocean Beauty in 2019 and alleges

6    she was paid only once at the end of a six-week processing season. (Id. ¶¶ 19-20.) And both

7    Plaintiffs were hired for the 2020 processing season, but were terminated after spending 29 days

8    in quarantine before they could perform any fish processing. (Id. ¶¶ 21-22; see Exs. 7 & 8 to the

9    Declaration of Toby Marshall (Dkt. Nos. 54-7 and 54-8).) They were paid $75 per day in

10   quarantine. (See Marshall Decl. Exs. 5 & 6 (Dkt. Nos. 54-5 and 54-6).)

11       Defendant Ocean Beauty has operated fish processing plants in Alaska since the 1990s,

12   while OBI is a newer company that resulted from the merger of Ocean Beauty and Icicle

13   Seafoods in 2020. (See Rule 30(b)(6) Deposition of Tony Ross at 36-37 (Dkt. No. 54-1) (Ross

14   Dep.); Answer ¶ 10 (Dkt. No. 9).) In 2019 Ocean Beauty employed roughly 1,400 people at five

15   fish processing plants in Alaska, a "large portion" of whom were fish processors. (Ross Dep. at

16   36-38, 39.) On June 1, 2020, OBI took over operation of these plants which employed roughly

17   1,500 employees. (Id. at 32; 36-37.)

18   **B.    Quarantine Class**

19       In March, 2020, Alaska issued various mandates requiring all people arriving in Alaska

20   to self-quarantine to avoid the spread of COVID-19. (Exs. A and B to the Declaration of Renea

21   Saade (Dkt. Nos. 67-1 & 67-2).) The mandates also required "critical infrastructure" businesses,

22   of which fish processing is one, to prepare and submit a "travel plan or protocol" to "take

23   reasonable care to protect their staff and operations during this pandemic." (Saade Decl. Ex. C at

24

1 (Dkt. No. 67-3).) The mandate imposed monetary fines and possible imprisonment if

quarantine rules were violated. (Saade Decl. Ex. B.) The mandate also required companies

employing out-of-state workers to make sure employees traveled straight to a quarantine location

where they were to stay on premises, practice social distancing, and limit any visits except for

those with medical personnel. (Marshall Decl. Ex. 3.)

Consistent with the mandates, Ocean Beauty prepared a COVID-19 protocol that required

all arriving workers to quarantine as follows:

> Arriving employees shall be expected to stay on the premises for a minimum of 14 days. They will be quarantined in designated groups during this period. During this period, they are allowed to work and move around the premises but will be restricted from integrating with other quarantine groups or those who have completed their 14 day quarantine period (The "Resident" group) or entering the local community unless they need to seek medical care. Employees will sign a statement that they will be terminated and sent home if they violate this rule. The premises will be protected by any of the following: patrolled by a guard, security cameras, and fencing. All facilities will have posted warning signs. After this 14-day period they will become part of the resident group, however all employees must receive written permission by plant management before employees can leave the premises and enter the community.

(Saade Decl. Ex. D at 4 (Dkt. No. 67-4).) Ocean Beauty updated these procedures in May 2020.

(Saade Decl. Ex. H (Dkt. No. 67-8).) The only notably change was to disallow quarantining

employees from work unless they could be socially distanced. (Id. at 5.)

Defendants' corporate witness testified that during the 2020 season, OBI required all

employees traveling from outside of Alaska to quarantine before beginning fish processing work.

(Ross Dep. at 78-81; see Answer ¶ 3.) In 2020, several hundred workers at all of OBI's fish

processing facilities were subject to quarantine. (Ross Dep. at 47-48.) Initially employees

quarantined in Seattle, but by July 2020 employees were quarantining in Alaska. (Id. at 79-80.)

And workers could complete quarantine in their own homes, though it is unclear how many

people did so. (See Declaration of Tony Ross at ¶ 8 (Dkt. No. 77).) And in 2021, a smaller

1    number of workers were subject to a quarantine given that there were exceptions for fully-

2    vaccinated individuals. (Ross Dep. at 145-146.) Defendants identify various differences in the

3    "amenities, accommodations or experiences" of those in quarantine that differed based on the

4    location of quarantine. (Ross Decl. ¶ 10.) Variations include the style of accommodation

5    (bunkhouse, apartment, or hotel), eating arrangements (dining in mess halls or in rooms), and

6    entertainment options (cable TV, internet, and movies on demand). (Id. ¶ 11.) Defendants also

7    maintain that those in quarantine could take smoke breaks, complete orientation, and work. (Id.)

8    　　　　Defendants paid employees $75 per day spent in quarantine. This decision was made by

9    considering the wages an employee would make over a 40 hour work week at a prevailing rate of

10    $12.19/hour. (See Ross Dep. at 103-07.) Defendants then set the "stipend" to exceed this amount

11    by roughly $5. (Id. at 106.)

12    　　　　Consistent with the quarantine procedures, Plaintiffs went into quarantine upon their

13    arrival from Serbia in June 2020. Plaintiffs first quarantined in Seattle for two days before

14    traveling to OBI's processing facility in Naknek, Alaska where they quarantined in apartments.

15    (Compl. ¶¶ 21-22, 37.) Plaintiffs spent 29 days total in quarantine, but Plaintiffs were terminated

16    before they began fish processing work. Plaintiffs purportedly violated the quarantine

17    requirements when Marija visited Dusan in his apartment after she tested positive for COVID-

18    19. (Marshall Decl. Exs. 7 & 8.) Plaintiffs dispute the basis for their termination. Ultimately

19    Plaintiffs were paid only $75/day, which they received more than a month after they arrived and

20    which was paid on a monthly basis. (Marshall Decl. Exs. 5 & 6.)

21    **C.    Pay Delay Class**

22    　　　　Plaintiffs' Pay Delay Class involves allegations that Defendants failed to pay all fish

23    processors on a biweekly basis as required by law. Plaintiffs contend that employers of H-2B

24

visa workers who have an approved "job order" must pay both H-2B and non-H-2B employees doing "corresponding employment" on a biweekly basis. See 29 C.F.R. §§ 503.4 & 503.16(h). They argue that this is also the pay frequency due under the AWHA. The Court reviews the facts relevant to the federal regulations on which Plaintiffs' claim turns.

First, Plaintiffs have provided evidence that not all fish processors were paid biweekly. Whether employees were paid biweekly appears to have been dependent on the location where they worked. (Ross Dep. at 114-115.) And the decision about the frequency was made centrally by the HR Manager at Defendants' corporate headquarters. (See id. at 118.) In 2019 there were between 300 to 600 fish processors who were paid less frequently than every two weeks, though that number shrank in 2020. (Id. at 115, 120.) Defendants have not provided any evidence that any employees agreed to be paid less frequently than every two weeks.

Second, Plaintiffs have provided evidence that Defendants had H-2B job orders from March 2019 through October 20, 2019 and December 10, 2019 to October 10, 2020 for "fish processing." (See Dkt. No. 76-1 (covering from December 10, 2019 through October 10, 2020); Marshall Supp. Decl. Ex. 1 (Dkt. No. 87-1) (covering January 1, 2019 to October 20, 2019).) Plaintiffs also suggest in a footnote that there may be further evidence of other job orders that Defendants have not yet produced. (See Reply at 10 n.8 (Dkt. No. 86).)

Third, as to "corresponding employment," Plaintiffs point to testimony from Defendants' corporate witness that fish processing work is a broad category that applies consistently to seafood processors at any of locations where Defendants operate. (See Ross Dep. at 60-61, 65-66.) The act of performing fish processing appears the same whether one is an H-2B or non-H-2B worker. And after OBI came into existence in 2020, Defendants could identify no differences in the employment structure for fish processors. (Id. at 71.) Additionally, no fish processor is part

1    of a collective bargaining agreement and only about thirty-percent of employees at one plant

2    work year-round. (Id. at 69-70.)

3                                    **ANALYSIS**

4    **I.       Motion for Class Certification**

5    **A.    Class Certification Standard**

6           Courts must undertake a "rigorous analysis" of all the Rule 23 factors to determine

7    whether to certify a class. Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 351 (2011). The

8    plaintiff must first meet all four requirements in Rule 23(a): numerosity, commonality, typicality,

9    and adequacy of representation. See Leyva v. Medline Indus., 716 F.3d 510, 512 (9th Cir. 2013);

10   Fed. R. Civ. P. 23(a). The plaintiff must also satisfy one of the Rule 23(b) factors. Here Plaintiffs

11   seek certification under the "predominance" standard of Rule 23(b)(3). "To obtain certification

12   of a class action for money damages under Rule 23(b)(3)," a putative class must also establish

13   that "the questions of law or fact common to class members predominate over any questions

14   affecting only individual members." Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455,

15   460.

16          Plaintiffs must demonstrate the prerequisites of Rule 23 by a preponderance of the

17   evidence. Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC, 31 F.4th 651, 665

18   (9th Cir. 2022). "In carrying the burden of proving facts necessary for certifying a class under

19   Rule 23(b)(3), plaintiffs may use any admissible evidence." Id. "In order for the plaintiffs to

20   carry their burden of proving that a common question predominates, they must show that the

21   common question relates to a central issue in the plaintiffs' claim." Id. (citing Wal-Mart, 564

22   U.S. at 349–50). And "[c]onsidering whether 'questions of law or fact common to class members

23

24

1   predominate' begins, of course, with the elements of the underlying cause of action." <u>Erica P.</u>

2   <u>John Fund, Inc. v. Halliburton Co.</u>, 563 U.S. 804, 809 (2011) (quoting Fed. R. Civ. P. 23(b)(3)).

3        "In making the determinations necessary to find that the prerequisites of Rule 23(b)(3)

4   are satisfied, the district court must proceed just as the judge would resolve a dispute about any

5   other threshold prerequisite for continuing a lawsuit." <u>Olean</u>, 31 F.4th at 666 (citation and

6   quotation omitted). The "court must make a rigorous assessment of the available evidence and

7   the method or methods by which plaintiffs propose to use the [class-wide] evidence to prove the

8   common question in one stroke." <u>Id.</u> (citation and quotation omitted). "In addition, the court

9   must find that this common question (i.e., the 'common, aggregation-enabling' issue)

10  predominates over individual issues." <u>Id.</u> (quoting <u>Tyson Foods, Inc. v. Bouaphakeo</u>, 577 U.S.

11  442, 453 (2016)).

12       Below, the Court reviews the Rule 23(a) and 23(b)(3) requirements in the context of this

13  case and as applied to the two proposed classes.

14  **B.**       **Rule 23(a)(1): Numerosity**

15       Numerosity exists when "the class is so numerous that joinder of all members is

16  impractical." Fed. R. Civ. P. 23(a)(1). "The numerosity requirement requires examination of the

17  specific facts of each case and imposes no absolute limitations." <u>Gen. Tel. Co. of the Nw. v.</u>

18  <u>Equal Emp. Opportunity Comm'n</u>, 446 U.S. 318, 330 (1980). Here, there is no serious challenge

19  to numerosity and there appear to be hundreds of members in both classes. The Court finds

20  numerosity satisfied.

21  **C.**       **Rule 23(a)(2) Commonality and Rule 23(b)(3) Predominance**

22       The Parties dispute both commonality and predominance, which the Court considers

23  together given their overlapping nature. <u>See, e.g.</u>, <u>Valentino v. Carter–Wallace, Inc.</u>, 97 F.3d

24

1227, 1234 (9th Cir. 1996) ("Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy."). After reviewing the requirements of Rule 23(a)(2) and Rule 23(b)(3), the Court assesses the claim elements and both commonality and predominance first as to the Quarantine Class and then as to the Pay Delay Class.

### 1.    Rule Requirements

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." Wal-Mart, 564 U.S. at 349–50 (citation and quotation omitted). To satisfy commonality, the claims must depend on a common contention "that is capable of classwide resolution." Id. at 350. "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." Id. (quotation and citation omitted). "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." Id. (quotation and citation omitted).

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Products, Inc. v. Windsor, 521 U.S. 591, 623 (1997). "This calls upon courts to give careful scrutiny to the relation between common and individual questions in a case." Tyson Foods, 577 U.S. at 453. "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." Id. (citation and quotation omitted). "The Rule 23(b)(3) predominance inquiry asks the court to

make a global determination of whether common questions prevail over individualized ones." Torres v. Mercer Canyons Inc., 835 F.3d 1125, 1134 (9th Cir. 2016). "Considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action." Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809 (2011) (internal quotation marks omitted).

**2.     Quarantine Class**

        **a.     Elements of the Quarantine Claims**

        The commonality and predominance inquiry require the Court to first examine the elements of Plaintiffs' claims under the AWHA. See Halliburton, 563 U.S. at 809. Under the AWHA, "[e]xcept as otherwise provided for in law, an employer shall pay to each employee a minimum wage, as established herein, for hours worked in a pay period, whether the work is measured by time, piece, commission or otherwise." Alaska Stat. Ann. § 23.10.065 (West). To assess whether wages are due the Court must "determine whether the employees were actually working" and the "extent employees can use their time for their own purposes." Air Logistics of Alaska, Inc. v. Throop, 181 P.3d 1084, 1090 (Alaska 2008). The Alaska Supreme Court follows the "substantial federal jurisprudence dealing with the similar question of whether an employee's time should be counted as compensable for the purposes of the Fair Labor Standards Act (FLSA)." Id. Under federal law, there is no bright-line test. Armour & Co. v. Wantock, 323 U.S. 126, 132 (1944). Instead, the court analyzes "two predominant factors when dealing with this question: '(1) the degree to which the employee is free to engage in personal activities; and (2) the agreements between the parties.'" Throop, 181 P.3d at 1090 (quoting Owens v. Local No. 169, Ass'n of W. Pulp & Paper Workers, 971 F.2d 347, 350 (9th Cir. 1992) (footnotes omitted)). The Alaska Supreme Court has adopted the Ninth Circuit's analytic framework when considering claims under the AWHA. See Moody v. Lodge, 433 P.3d 1173, 1179 (Alaska 2018).

This includes adoption of the following analytic framework set forth in <u>Owens</u> as to the first element—the "degree to which the employee is free to engage in personal activities":

> (1) whether there was an on-premises living requirement; (2) whether there were excessive geographical restrictions on employee's movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a fixed time limit for response was unduly restrictive; (5) whether the on-call employee could easily trade on-call responsibilities; (6) whether use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in time. Such a list is illustrative, not exhaustive. No one factor is dispositive.

<u>Throop</u>, 181 P.3d at 1091 (quoting <u>Owens</u>, 971 F.2d at 350–51 (footnotes omitted)).

In sum, to prove that time spent in quarantine was compensable, Plaintiffs will need to prove on a classwide basis that: (1) members of the Quarantine Class lacked a reasonable degree of personal freedom while in quarantine, and (2) there is no agreement that might show the quarantine time was personal. <u>See Throop</u>, 181 P.3d at 1090.

### b.      Quarantine Class Commonality and Predominance

Plaintiffs identify three questions that identify common issues that satisfy commonality and predominance: (1) whether the time spent in quarantine was compensable; (2) how much time is compensable; and (3) whether Defendants had a uniform policy of paying $75 per day for time in quarantine. (Mot. at 12 (Dkt. No. 53 at 19).) The Court reviews these questions as they apply to the elements of the claims and the proposed classwide evidence.

Plaintiffs' first common issue tracks a necessary claim element that can be resolved on a classwide basis. This first issue essentially asks whether class members lacked a reasonable degree of freedom to engage in personal activities such that their time in quarantine was compensable "work" under the AWHA. <u>See Throop</u>, 181 P.3d at 1090. This goes to the heart of Plaintiffs' quarantine pay claim. And Plaintiffs have identified a common means of proving that the time in quarantine deprived all class members of sufficient personal freedom to render the time spent compensable work. The primary evidence cited are Defendants' quarantine rules and

1    policies. As presented by Plaintiffs, these rules and policies imposed uniform restrictions on all

2    class members' ability to leave their quarantine locations and interact with others outside of their

3    limited quarantine quarters and groups. The rules were also enforceable by termination, a fate

4    Plaintiffs met. The Court agrees with Plaintiffs that the quarantine rules and requirements

5    provide a means of answering this common, central contention—whether time in quarantine was

6    compensable—on a classwide basis. Given the uniform nature of the restrictions on personal

7    freedom, there do not appear to be individualized issues that would predominate in determining

8    whether all members of the class were performing compensable work during their individual

9    quarantines. To this end, the Court also notes that Defendants appear to have recognized that

10   time in quarantine was compensable given that the $75/day "stipend" was based, in large part, on

11   a theoretical 40 hour work week. (<u>See</u> Ross Dep. at 106-07; Defs. Opp. to Class Cert at 7-8.) The

12   Court also notes that there is no evidence that individual employees agreed to the quarantine pay

13   rate. (<u>See</u> Ross Dep. at 129 (noting his lack of awareness of any employees agreeing to the

14   quarantine pay rate).)

15        The Court reaches this decision without ignoring Defendants' contrary arguments. First,

16   Defendants argue that "[e]mployees that were quarantined were free to spend their time as they

17   saw fit" such that the quarantine rules did not deprive them of personal freedom. (Opp. at 7.) But

18   the evidence Defendants cite—Tony Ross's Declaration—does not support Defendants'

19   assertion. The Ross Declaration merely says that employees could take smoke breaks, work,

20   complete orientation, leave the room to take meals (if allowed), and if possible, access the

21   internet, watch TV, order room service or watch movies. (Ross Decl. ¶ 11.) These limited

22   activities do not support the notion that the employees were "free to spend their time as they saw

23   fit." (Opp. at 7.) These same employees could not move about freely in space or interact with

24

others of their choosing. Second, Defendants fail to convince the Court that the variations in the kinds of accommodations or amenities undermine commonality and predominance. The Court accepts that, for example, some class members could order room service from their hotel rooms and watch movies while others had to take meals in a mess hall and read books in the bunkhouse. But Defendants offer no basis to believe that these differences render the compensability analysis any different as between class members. Defendants may succeed in proving that the nature of the amenities and kind of accommodation permitted employees to engage in personal activities while in quarantine. But whether one employee could read while another could watch movies does not impact the fundamental question of whether either had sufficient freedom to call any of the activities Defendants identify as "personal" ones. The question, instead, is "'whether the employee had actually engaged in personal activities during call-in time.'" Throop, 181 P.3d at 1091 (quoting Owens, 971 F.2d at 350–51). The answer to that question does not differ based on the different kinds of accommodations or entertainment options Defendants identify. The Court rejects Defendants' arguments that individualized issues will predominate over common ones.

Plaintiffs' second issue—how much time spent in quarantine is compensable—identifies another essential element of their claim critical to liability. As Plaintiffs recognize, their claim requires proof that each class member was due more than the $75 per day that was paid. Although not well articulated in their briefing, Plaintiffs explained at oral argument that they seek compensation for every hour spent in quarantine—24 hours a day. The Court finds this theory consistent with Plaintiffs' contention that the quarantine restrictions were sufficiently restrictive on personal activities that all of the time in quarantine is compensable. The same classwide evidence Plaintiffs identify as to whether the time is compensable appears to be relevant to resolving this second question on a classwide basis. Defendants offer no cogent

1    argument as to why an individualized inquiry is necessary if all class members were subject to

2    the same 24-hour-a-day restrictions on their personal freedom. (See Opp. at 12-13.) The Court

3    therefore finds that Plaintiffs have sufficiently identified a common issue necessary to their claim

4    that can be resolved on a classwide basis where individual issues do not predominate.

5        The Parties appear not to dispute Plaintiffs' third issue—the uniform nature of

6    Defendants' quarantine policy. Plaintiffs have provided evidence that Defendants maintained a

7    uniform policy applicable to quarantine. And Plaintiffs have provided testimony from

8    Defendants' corporate witness that there were no unique agreements with employees about

9    quarantine pay. (Ross Dep. at 129.) While this issue is not necessarily critical to resolving

10   Plaintiffs' claim under the AWHA, it is important to Plaintiffs' ability to prove liability on a

11   classwide basis. Without a uniform policy, Plaintiffs have not identified any other common

12   means of proving their claim on a classwide basis. As such, the Court considers this issue an

13   important, though not dispositive one to the class certification inquiry.

14       Having considered the arguments and evidence, the Court finds that both commonality

15   and predominance are satisfied as to the Quarantine Class.

16       **3.      Pay Delay Class**

17           **a.      Elements of Pay Delay Claims**

18       Plaintiffs allege that Defendants violated the AWHA by failing to pay all employees

19   every two weeks. Plaintiffs' theory starts with the proposition that "Alaska law directly 'provides

20   that employers must pay their employees at regular intervals' and claims concerning pay delay

21   'are to be construed as claims under the underlying authority that defines what wages are due.'"

22   (Mot. at 19 (quoting Thornton v. Crazy Horse, Inc., No. 3:06-CV-00251-TMB, 2012 WL

23   2175753, at *9 (D. Alaska June 14, 2012)). As evidence of the applicable "regular interval,"

24   Plaintiffs then invoke federal regulations applicable to H-2B visa workers that require payment

"at least every 2 weeks or according to the prevailing practice in the area of intended

employment, whichever is more frequent." 29 C.F.R. § 503.16(h). These regulations apply not

only to H-2B visa workers, but also to "any workers in corresponding employment." 29 C.F.R. §

503.16. "Corresponding employment" means:

> The employment of workers who are not H-2B workers by an employer that has a
> certified H-2B Application for Temporary Employment Certification when those workers
> are performing either substantially the same work included in the job order or
> substantially the same work performed by the H-2B workers. . .

29 C.F.R. § 503.4. In other words, so long as the non-H-2B workers are doing "substantially the

same work" as the H-2B workers, they must be paid on the same biweekly basis. And "[t]o

qualify as corresponding employment, the work must be performed during the period of the job

order, including any approved extension thereof." 29 C.F.R. § 503.4 "Corresponding

Employment" Definition (2). Defendants point out that there are exclusions from the definition

of "corresponding employment" that apply to those effectively employed year-round or who are

part of a collective bargaining agreement. 29 C.F.R. § 503.4 Corresponding Employment (1)(i)-

(ii).

### b.    Pay Delay Class Commonality and Predominance

Common questions predominate over individual ones as to the core elements of

Plaintiffs' Pay Delay claim. First, Plaintiffs have provided evidence that Defendants hired H-2B

fish processors in 2019 and 2020 and had H-2B job orders from at January 2019 through October

20, 2019 and from December 10, 2019 through October 10, 2020 . (See Dkt. No. 76-1; Marshall

Supp. Decl. Ex. 1 (Dkt. No. 87-1).) Second, Plaintiffs provide common evidence that fish

processing work is substantially the same for H-2B and non-H-2B workers, which is required to

establish the "corresponding employment" element. Lastly, Defendants admit that some workers

were not paid biweekly. While there is some variation in the pay frequency, Plaintiffs have

convinced the Court that the pay records can be used to quickly determine whether an employee was paid biweekly or not—and therefore in or out of the class. The Court also agrees with Plaintiffs that a common question to be resolved on a classwide basis is whether the federal regulations requiring biweekly pay applies and is enforceable under the AWHA. Plaintiffs have therefore shown that there are common questions concerning the elements of their claim that can be answered with common, classwide evidence. The Court finds commonality and predominance satisfied as to the Pay Delay Class.

The Court remains unconvinced by Defendants arguments against commonality and predominance. First, Defendants argue that the class cannot include any non-H-2B worker who either did not perform "corresponding" fish processing work or worked outside of a "job order" period. But as Plaintiffs point out, non-fish processors fall outside of the class definition and do not pose a problem insofar as commonality and predominance. (See Ross Dep. at 61.) Similarly, Plaintiffs have identified the periods of time during which "job orders" were in place for fish processing for H-2B workers and those periods can be used to sort through the damages calculations without running into individualized issues. Second, Defendants suggest that commonality fails because some workers were paid biweekly and others monthly. (Opp. at 14.) But this argument ignores the fact that anyone paid biweekly would be excluded by the class definition. And based on the Court's review of the pay records submitted, they appear sufficiently detailed to make this determination with relative ease. Lastly, although Defendants cite to exceptions to "corresponding employment" they only offer evidence that about 30% of workers at one location were year-round workers that may be exempt from the biweekly payment requirements. Excluding these individuals appears to be a matter of relatively simple accounting that does not threaten commonality and predominance.

1     **D.      Rule 23(a)(3): Typicality**

2           To demonstrate typicality, Plaintiffs must show that their claims are typical of the classes.

3     Fed. R. Civ. P. 23(a)(3). "The test of typicality 'is whether other members have the same or

4     similar injury, whether the action is based on conduct which is not unique to the named

5     plaintiffs, and whether other class members have been injured by the same course of conduct.'"

6     Hanon v. Dataprods. Corp., 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted). "Typicality

7     refers to the nature of the claim or defense of the class representative, and not to the specific

8     facts from which it arose or the relief sought." Id. (internal citation and quotation marks omitted).

9     "The requirement is permissive, such that "representative claims are 'typical' if they are

10    reasonably coextensive with those of absent class members; they need not be substantially

11    identical." Just Film, Inc. v. Buono, 847 F.3d 1108, 1116 (9th Cir. 2017) (quoting Parsons v.

12    Ryan, 754 F.3d 657, 685 (9th Cir. 2014)). "The purpose of the typicality requirement is to assure

13    that the interest of the named representative aligns with the interests of the class." Hanon, 976

14    F.2d at 508.

15          The Court finds the named Plaintiffs' claims are typical of both classes. As to the

16    Quarantine Class, Plaintiffs' claims are typical of the others in the class who were subject to the

17    same quarantine rules and restrictions. And because Plaintiffs seek wages for every hour spent in

18    quarantine, Plaintiffs' request for wages due is common to the class. As to the Pay Delay class,

19    Plaintiffs' claims are typical of the Class's claims. Plaintiffs were hired as fish processors on H-

20    2B visas and, per Plaintiffs' theory of the case, were due wages every two weeks like all other H-

21    2B workers and non-H-2B fish processing workers during a "job order" period. Defendants

22    identify no material way in which Plaintiffs' claims are atypical. The only real distinction

23

24

1   identified is a legal one—H-2B or not H-2B. But that distinction does not impact typicality of the

2   Pay Delay Class's claims. The Court therefore finds typical satisfied for both classes.

3   **E.**    **Rule 23(a)(4): Adequacy**

4         Rule 23(a) also requires that "'the representative parties will fairly and adequately protect

5   the interests of the class.'" <u>Hanlon v. Chrysler Corp.</u>, 150 F.3d 1011, 1020 (9th Cir. 1998)

6   (quoting Fed. R. Civ. P. 23(a)(4)), <u>overruled on other grounds by</u> <u>Wal-Mart</u>, 564 U.S. 338.

7   Adequacy of representation requires that "[f]irst, the named representatives must appear able to

8   prosecute the action vigorously through qualified counsel, and second, the representatives must

9   not have antagonistic or conflicting interests with the unnamed members of the class." <u>Lerwill v.</u>

10   <u>Inflight Motion Pictures, Inc.</u>, 582 F.2d 507, 512 (9th Cir. 1978). As to class counsel, the Court

11   must also assess the following requirements of Rule 23(g):

12          (i) the work counsel has done in identifying or investigating potential claims in the
            action;

13          (ii) counsel's experience in handling class actions, other complex litigation, and the types
            of claims asserted in the action;

14          (iii) counsel's knowledge of the applicable law; and
            (iv) the resources that counsel will commit to representing the class.

15

16   Fed. R. Civ. P. 23(g)(1)(A). The Court may also consider "any other matter pertinent to

17   counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P.

    23(g)(1)(B). And class counsel must "fairly and adequately represent the interests of the class."

18   Fed. R. Civ. P. 23(g)(4).

19         Plaintiffs are adequate class representatives. They have been involved in the case, as their

20   counsel avers. (<u>See</u> Declaration of Tamara Kenworthy ¶¶ 12-13 (Dkt. No. 55).) They are also

21   willing to travel to the United States for trial. (<u>See</u> Declarations of Dusan and Marija Paunovic

22   (Dkt. Nos. 88, 89).) And Defendants identify no antagonistic relationship between Plaintiffs and

23   the classes.

24

1  The Court also finds class counsel is adequate to represent the classes. Counsel from

2  Terrell Marshall Law Group PLLC are experienced in class action litigation and have brought to

3  bear their significant knowledge of the applicable law in litigating this matter to date. Similarly,

4  Ms. Kenworthey from Kenworthey Law PLLC has demonstrated a commitment to the case,

5  though she has less class action experience. All of the attorneys and law firms appear committed

6  to the class and this case. They have also committed significant time and resources to litigate this

7  matter to date. The Court is satisfied that they will fairly and adequately represent the interest of

8  the classes. The Court therefore appoints Terrell Marshall Law Group PLLC and Kenworthey

9  Law PLLC as class counsel.

10  **F.    Rule 23(b)(3): Superiority**

11  "In determining superiority, courts must consider the four factors of Rule 23(b)(3)."

12  Zinser v. Accufix Rsch. Inst., Inc., 253 F.3d 1180, 1190 (9th Cir.), as amended on denial of

13  reh'g, 273 F.3d 1266 (9th Cir. 2001). The four factors are:

14  (A) the class members' interests in individually controlling the prosecution or defense of
    separate actions;

15  (B) the extent and nature of any litigation concerning the controversy already begun by or
    against class members;

16  (C) the desirability or undesirability of concentrating the litigation of the claims in the
    particular forum; and

17  (D) the likely difficulties in managing a class action.

18  Fed. R. Civ. P. 23(b)(3)(A)-(D).

19  The Court finds superiority satisfied as to both classes. As to both classes, the Court finds

20  that a single class action is a superior means to vindicate the claims Plaintiffs present.

21  Coordinating the litigation is desirable given the relatively small individual amounts at issue, the

22  limited interest each class member likely has in directing the litigation, and the desirability in

23  having one court resolve this legal and factual issue for all class members. Nor are there any

24

readily identified difficulties in managing the case. The common evidence appears largely within the control and custody of Defendants and computing damages does not appear to be pose any particularly vexing problems given the nature of the payroll records.

Defendants suggest that because the Court has already conditionally certified the FLSA pay delay claims, there is no reason to also certify the Pay Delay Class. But Defendants cite to no authority for this proposition. And as Plaintiffs point out, the class and collective action cover different time periods, involve different minimum wages, have different opt-in v. opt-out claim types, and must meet different legal standards. The Court does not find this undermines superiority.

**G.      Conclusion**

The Court finds that class certification of both the Quarantine Class and Pay Delay Class is appropriate. The Court GRANTS the Motion for Class Certification, CERTIFIES both classes as proposed, APPOINTS the named Plaintiffs as class representatives, and APPOINTS Terrell Marshall Law Group PLLC and Kenworthey Law PLLC as class counsel. The Court DIRECTS Plaintiffs to present a proposed notice plan and form of notice within 21 days of entry of this Order.

**II.      Motion to Certify Question and Stay**

Defendants argue that the Court should stay any ruling on class certification and instead certify a question to the Alaska Supreme Court as to whether the time employees spent in quarantine is subject to the AWHA. The Court finds no merit in these requests.

**A.      Background**

Defendants ask the Court to certify the following question to the Alaska Supreme Court:

Did the minimum wage requirements of the Alaska Wage and Hour Act apply to fish processing workers during the mandatory COVID-19 quarantine period the State of Alaska required the workers to complete prior to beginning work during the 2020 season?

(Mot. at 1. (Dkt. No. 66).) Defendants maintain that this question is dispositive of "Plaintiffs' claim that the state-mandated COVID-19 quarantine period was 'compensable work time.'" (Id. at 2.) And they assert that this is "a pure question of law based on the Alaska Wage and Hour Act." (Id.)

Defendants also ask the Court to stay the entire case until after the Alaska Supreme Court resolves the certified question. (Reply to Mot. to Stay at 2 (Dkt. No. 83).)

**B.      Relevant Legal Standard**

Under Alaska law, the Court may certify "questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is not controlling precedent in the decisions of the supreme court of this state." Alaska R. App. P. 407(a). "The decision to certify a question to a state supreme court rests in the 'sound discretion' of the district court." Eckard Brandes, Inc. v. Riley, 338 F.3d 1082, 1087 (9th Cir. 2003).

**C.      Certification Unnecessary**

The Court finds several reasons why certification is improper.

First, there exists controlling law as to how to determine whether time spent working or waiting is compensable time under the AWHA. The Parties cite to and rely on that authority in disputing the Motion for Class Certification. This existing Alaskan precedent, which includes expansive federal jurisprudence, provides sufficient guidance for the Court to determine whether time in quarantine is compensable. Even though the quarantine mandate presents unique factual

1   issues, there is no reason to conclude that the existing case law is insufficient to resolve the

2   merits of Plaintiffs' claims. This is fatal to Defendants' Motion to Certify.

3     Second, Defendants fail to provide any reason why the Alaska COVID-19 quarantine

4   mandate absolved them of compliance with the AWHA's minimum wage requirements.

5   Defendants represented at oral argument that they would not argue that the COVID-19 mandates

6   created an exception to compliance with the AWHA. Instead, Defendants apparently wish to

7   argue as a legal matter that any time in quarantine falls outside of the AWHA. But without some

8   identifiable legal exception to the AWHA, Defendants have not shown why the existing

9   authority, as explained in <u>Throop</u> and <u>Moody</u> would not guide resolution of this contention. This,

10  too, is fatal to Defendants' Motion to Certify.

11    Third, the question presented turns on contested facts. Under the <u>Moody</u> and <u>Throop</u>

12  framework applicable to AWHA claims, the analysis of whether time spent waiting to work is

13  compensable is fact intensive. While Plaintiffs have advanced a classwide theory of liability that

14  is common to the class, the Court has yet to resolve the many factual disputes raised by the

15  parties. Certification of a question that involves disputed facts would therefore likely undermine

16  the value of any decision from the Alaska Supreme Court.

17    Ultimately, the Court remains unconvinced that any additional guidance is necessary

18  from the Alaska Supreme Court beyond the existing jurisprudence to resolve the legal issues

19  presented. The Court therefore DENIES the Motion to Certify the Question.

20  **D.   Motion to Stay**

21    Given the Court's denial of the Motion to Certify the Question, the Court finds the

22  request to stay the action to be unnecessary. The Court DENIES the Motion to Stay as MOOT.

23     **III.   Motion to Amend Case Schedule and Complaint**

24

1    Plaintiffs ask the Court to allow them to amend the Complaint after the deadline to add

2    overtime claims as to the Quarantine Class and several clerical changes. The Court finds that

3    there is insufficient good cause to allow the amendment after the deadline and DENIES the

4    Motion.

5    Because the deadline for amending the pleadings has long since passed, Plaintiffs must

6    demonstrate good cause to amend the scheduling order under Rule 16(b)(4). (See Dkt. No. 22

7    (setting amended pleading deadline for Nov. 29, 2021)).) Rule 16(b)(4) primarily focuses on the

8    diligence of the party seeking the amendment. See Johnson v. Mammoth Recreations, Inc., 975

9    F.2d 604, 609 (9th Cir. 1992). The court's scheduling order may be modified "if it cannot

10   reasonably be met despite the diligence of the party seeking" the modification. Id. (quoting Fed.

11   R. Civ. P. 16 advisory committee notes (1983 amendment). Only if Plaintiffs satisfy Rule

12   16(b)(4) will the Court then consider whether amendment is proper under Rule 15.

13   Plaintiffs assert that they merely want to make "clarifying amendments" to the Complaint

14   to explicitly plead claims for overtime under the AWHA. (Mot. at 4.) And Plaintiffs argue that

15   good cause exists because the pleading amendment deadline "expired early in the litigation,

16   before the parties could engage in any substantial discovery." (Mot. at 4.) The Court notes that

17   this case was filed in May 2019, removed to this Court in late June 2019, and the deadline for

18   amendments was set for November 29, 2019. (See Dkt. Nos. 1, 1-1, and 22.) But Plaintiffs do not

19   identify any new facts that they learned through discovery that has prompted the requested

20   amendment to the case schedule. Instead, Plaintiffs state that they had always intended to seek

21   overtime and that the initial complaint expressly claimed that "the compensable amounts of

22   quarantine could exceed eight hours per day, and thus forty hours per week. . . ." (Id.) And at

23   oral argument, counsel conceded they "should have pleaded" a claim for overtime given that

24

they "did know it from the beginning." And counsel stated that they "made the realization [to amend the Complaint] while briefing class certification."

Plaintiffs have not been sufficiently diligent to warrant a finding of good cause to amend the case schedule to allow an amended complaint. Although Plaintiffs suggest that they could not have met the initial amendment deadline because discovery had barely commenced, they admit that they have always intended to pursue claims for unpaid overtime. And Plaintiffs identify no facts that they have learned since filing the case that prompted the desire to amend. Rather, they tumbled to the desire to amend only while briefing class certification. On this record, the Court finds that Plaintiffs lacked diligence in pursuing an amendment and that there are no reasons that might excuse the failure to comply with the Court's existing deadline to amend the pleadings. The Court therefore DENIES the Motion for lack of good cause under Rule 16(b)(4) and does not reach the question of whether amendment is proper under Rule 15(a)(2).

Separately, the Court notes that this does not preclude Plaintiffs from pursuing their assertion that they worked 24 hours a day while in quarantine, given the existing allegation in the Complaint that they worked "eight hours or more" while in quarantine. (Compl. ¶ 104.) This merely precludes the addition of a claim for overtime pay under Alaska Statute 23.10.060.

### IV.   Motion to Amend Case Schedule

Plaintiffs ask the Court to amend the case schedule to give additional time for expert reports and to set a deadline for Defendants to produce class and collective damages data. Defendants largely agree with the Motion, though they ask for more time to produce damages information and for clarification of the existing case schedule.

The Court finds good cause to permit the amendment to the case schedule. As Plaintiffs correctly note, the Court's Order on the Motion for Class Certification impacts the expert report

disclosures, given that the deadline has passed since the Motion was briefed. Despite the Parties' diligence, they could not have complied with the existing deadline, which justifies the amendment under Rule 16(b)(4). See Johnson, 975 F.2d at 609. And given that the extension of the expert deadline will impact other existing deadlines, the Court ORDERS the Parties to meet and confer and submit a joint status report within one week of this Order identifying all of the remaining case deadlines that they wish to amend and the proposed dates.

The Court also clarifies that the case is subject to the Scheduling Order's dates in the section marked "If a Collective or Class Action is Certified." (Dkt. No. 22 at 2-3.) And the Court ORDERS Defendants to produce the remaining documents responsive to Plaintiffs' Request for Production No. 3 (regarding damages) within 25 days of entry of this Order.

## CONCLUSION

Having considered the briefing, the argument of the parties, and all supporting materials, the Court ORDERS as follows:

(1) The Court GRANTS the Motion for Class Certification, CERTIFIES both classes as proposed, APPOINTS the named Plaintiffs as class representatives, and APPOINTS Terrell Marshall Law Group PLLC and Kenworthey Law PLLC as class counsel. The Court DIRECTS Plaintiffs to present a proposed notice plan and form of notice within 21 days of entry of this Order;

(2) The Court DENIES Defendants' Motion to Certify Question and DENIES the Motion to Stay as MOOT;

(3) The Court DENIES Plaintiffs' Motion to Amend the Case Schedule and for Leave to Amend the Complaint; and

1    (4) The Court GRANTS Plaintiffs' Motion to Amend the Case Schedule and ORDERS

2  the Parties to meet and confer and submit a joint status report within one week of this Order. And

3  Defendants must produce class/collective damages discovery within 25 days of entry of this

4  Order.

5    The clerk is ordered to provide copies of this order to all counsel.

6    Dated September 9, 2022.

7

8    Marsha J. Pechman
     United States Senior District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24